# Richmond

## Bernard Fein v. Lanston Monotype Machine Company, A Corporation, Et Al.

January 17, 1955.

Record No. 4283.

Present, Eggleston, Spratley, Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*Wicker, Baker & Shuford; Bendheim, Fagelson, Bragg & Giammittorio* and *Gallop, Climenko & Gould,* for the appellant.

*Williams, Mullen, Pollard & Rogers; George R. Humrickhouse; Booth, Hudley, Koontz & Boothe; Donovan, Leisure, Newton & Irvine; Robert F. Morton; Boardman, Stoddard & McCarthy* and *Mansfield D. Sprague,* for the appellees.

SPRATLEY, J., delivered the opinion of the court.

This proceeding arises out of one of the issues in a bitter and prolonged controversy over a proposed merger of Lanston Monotype Machine Company, a Virginia corporation, and Lanston Industries, Inc., another Virginia corporation, into a single corporation to be thereafter called Lanston Industries. Bernard Fein, a stockholder of Lanston Monotype Machine Company, suing on behalf of himself and other similarly situated stockholders, objecting to the proposed merger agreement, filed a petition in the Corporation Court of the City of Alexandria, pursuant to § 13-205, Code of Virginia, 1950, complaining of the manner in which the election of directors of his Corporation was being conducted

at a stockholders' meeting called for that purpose. From an order of the trial court holding that none of the stockholders was entitled to vote at the said meeting, and that the meeting was "a nullity and of no effect," this appeal was obtained.

In order to get a clear picture of the situation, it is necessary to make a chronological and detailed statement of the factual background of the proceedings in this case in the lower court, and the proceedings in several other forums in which other issues were raised between the same parties in connection with the proposed merger.

On March 4, 1953, the Board of Directors of Lanston Monotype Machine Company, hereinafter called Lanston, voted in favor of a merger with Lanston Industries, hereinafter called Industries. Code, § 13-43. Industries was organized and incorporated for the purpose of the proposed merger.

On March 27, 1953, stockholders of Lanston were given notice that the merger agreement would be submitted to them at a special meeting to be held on April 24, 1953. A proxy form and a proxy statement, including a copy of the merger agreement, were enclosed with the notice sent to the stockholders.

Section 11 of the agreement, pursuant to Code, § 13-43, provided that if a majority of all the votes cast at such meeting and at the meeting of the stockholders of Industries, was in favor of the agreement and merger, a certificate evidencing that fact, together with a copy of the agreement, would be presented to the State Corporation Commission of Virginia, and upon the certificate of approval by said Corporation Commission, the merger would be complete.

Section 12 of the agreement expressly provided, pursuant to Code, § 13-46, that notice of dissent by any stockholder might be served on a designated official of his corporation, at any time within sixty days of the date of the meeting of the stockholders of such corporation to act on the merger agreement, without awaiting the consummation of the merger. It also contained the following provision:

"This Agreement shall not be presented to the State Corporation Commission until the expiration of sixty (60) days after the date of the stockholders' meeting of Lanston or Lanston Industries, whichever is the latter called as provided in and for the purpose specified in Paragraph 11, hereof, and the Board of Directors of either Corporation may terminate this Agreement in lieu of presenting it to the State Corporation Commission, if, in the opinion of such Board of Directors, the merger, in all the circumstances, including the dissents, is impracticable or undesirable, (Code, § 13-46), and if such Board of Directors shall terminate this Merger Agreement, it shall become wholly void and of no effect, and there shall be no liability on the part of either Lanston or Lanston Industries or the Board of Directors or stockholders of either of them."

Prior to April 24, 1953, Security Banknote Company, hereinafter called Security, then owner of 30,691 shares or about 12% of Lanston's stock, and a number of other stockholders voiced opposition to the merger agreement. Security organized and sponsored a Stockholders Protective Committee, and made a vigorous solicitation of proxies to be voted against the merger. However, at the special meeting on April 24, 1953, the stockholders of Lanston approved the merger by a vote of 116,882 shares, 47% of the outstanding shares of Lanston, in favor of the merger; while 102,427 shares, or 41% of said stock voted in opposition. The merger agreement was approved by stockholders of Industries on May 25, 1953.

Subsequent to the stockholders' approval of the merger, Security and the Stockholders Protective Committee continued to attack the merger and urged stockholders to file dissents in an effort to dissuade the management of Lanston from proceeding to consummate the merger. As a result, more than 500 stockholders, owning approximately 100,000 shares, filed notices of dissent, between April 24th and June 24th, 1953, requesting the payment of the fair cash value of their stock, pursuant to Code, § 13-46, *et seq.* However,

the Board of Directors of Lanston refused to terminate the merger agreement.

Prior to May 5, 1953, the by-laws of Lanston provided that its Directors should be elected at the annual meeting of the Corporation to be held on the first Thursday in June of each year. In 1953, that day fell on June 4th, a date prior to the expiration of the sixty-day period, that is, July 25th, after which the merger agreement could, by its terms, be presented to the State Corporation Commission. On May 5, 1953, the Board of Directors of Lanston, at a special meeting, amended the by-laws, changing the date for the annual meeting to the last Thursday in July (July 30, 1953), a day subsequent to the date on which the agreement could, by its terms, be presented to the State Corporation Commission.

On or about June 16, 1953, Security and another stockholder filed a bill of complaint in the Circuit Court of the City of Alexandria against the two merging corporations and the Board of Directors of Lanston, alleging that the proposed merger was illegal and fraudulent. They prayed for an injunction restraining its consummation *pendente lite.* The bill averred that Security, subsequent to March 27, 1953, had purchased 26,000 shares of Lanston, 13,000 of which had voted for the merger on April 24, 1953, and that if it had been allowed to vote its stock on June 4, 1953, the date originally fixed for the regular annual stockholders' meeting, a new board of directors of Lanston opposed to the merger would have been elected, and the proposed agreement would not then be presented to the State Corporation Commission.

On June 18th, the Circuit Court entered a temporary order restraining the two merging corporations and the directors of Lanston from consummating the merger agreement and also enjoined the Board of Directors of Lanston from extending the date of the annual meeting of its stockholders beyond July 30, 1953. The order was effective to July 15, 1953. Lanston and the other defendants in that proceeding then moved to dismiss the temporary injunction;

but no other matter was considered. The motion was argued and on July 1, 1953, the court enjoined all parties from calling or holding any meeting of stockholders until it should determine whether or not to grant the motion to dismiss the order of June 18th. On July 15, 1953, the Circuit Court extended the temporary injunction and the restraining order of July 1, 1953. This action of the court prevented the holding of the annual stockholders' meeting proposed to be held on July 30, 1953, under the amended by-laws, for the election of directors.

On August 4, 1953, the Circuit Court granted the motion to dissolve the injunction order of June 18th, and the orders of July 1st and July 15th were also vacated as of August 11th. The cause was continued for trial on its merits and is still pending. Thereafter no meeting was called by the directors of Lanston for the election of directors. Code, § 13-204.

On August 11th and 14th, 1953, the directors of the merging corporations voted to submit the merger agreement to the State Corporation Commission, and that agreement was presented to that Commission on August 17, 1953, pursuant to Code, § 13-43.

In the meantime, during July, 1953, Security, having failed in its efforts to have the directors of Lanston reject the merger agreement, undertook further steps to obtain proxies from stockholders of Lanston opposed to the merger. It advised them that it would call a special meeting of the stockholders for the purpose of cancelling the agreement and for the election of directors opposed to the merger. Security was then, and at all times, the owner of more than one-tenth of the capital stock of Lanston. Code, § 13-190.

On August 18, 1953, Security, on behalf of itself and other stockholders of Lanston, filed a petition with the Corporation Commission, wherein it alleged that the merging corporations had not complied with the requirements of law, and that the proposed merger was illegal and unlawful. The Commission being of opinion that a public hearing should be held upon the application for merger, set the

hearing for October 19, 1953. In view of the litigation pending in the Circuit Court, the Commission, on the latter date, postponed its hearing until a future day.

On August 26, 1953, Security, then the owner of 53,490 shares of the capital stock of Lanston, acting through the Stockholders Protective Committee, called a special meeting of the stockholders for September 23, 1953, pursuant to Section 2 of Article 1 of the by-laws of Lanston and Virginia Code, § 13-190, for the purpose of electing eight directors and acting upon certain other specified matters. It is not disputed that the meeting was called for the purpose of electing directors who would be opposed to the merger. Both the management of Lanston and the Stockholders Protective Committee issued statements and solicited proxies from all stockholders for that meeting. In its statement to stockholders, Lanston contended that the special meeting was illegally called for an unlawful purpose, and that its solicitation of proxies was made only as to shares eligible to vote at that meeting.

On August 28, 1953, Lanston Industries, and another stockholder applied to the Circuit Court, in the suit therein pending, for a preliminary injunction forbidding the holding of any stockholders meeting until the Corporation Commission had heard the application for the merger. They also filed cross-bills in the pending Circuit Court action alleging that the actions of Security constituted a conspiracy between it and its associates to defraud Lanston and its stockholders of the benefit of the merger. The motions were denied, without respect to the merits of the legal questions involved. No appeal was taken.

Lanston then sought to prevent the September 23rd meeting by instituting a proceeding before the Securities and Exchange Commission, under the Federal Securities Exchange Act of 1934. The injunction requested was denied by the Commission. It next obtained from the United States District Court for the Southern District of New York an order directing Security and the Stockholders Protective Committee to show cause why they should not be restrained and

enjoined from violating § 14(a) of the Securities Exchange Act of 1934, relating to the solicitation of proxies, and from voting all proxies with respect to the stockholders meeting called to be held on September 23, 1953. On September 21, 1953, upon hearing the order to show cause, the court denied the application. The order, however, directed the adjournment of the special stockholders' meeting from September 23rd to September 25th, and complainants were given leave to appeal to the United States Court of Appeals for the Second Circuit. No appeal was taken.

The special stockholders' meeting called for September 23rd began on September 25th, 1953, and the question immediately arose as to the right of certain stockholders to vote. Lanston challenged all proxies offered on behalf of Security's candidates for membership on the Board of Directors of Lanston, with respect to those shareholders who had filed formal written dissents from the merger, upon the ground that a dissenting stockholder, as a matter of law, had no right to vote at said election. The inspectors of election sustained Lanston's challenges. Under this ruling, the candidates proposed by the management of Lanston received a majority of the votes allowed to be cast.

On September 26, 1953, during the progress of the balloting, Bernard Fein, hereinafter referred to as appellant, instituted this proceeding against Lanston Industries, seven of the eight Lanston directors, including its President and its Secretary, and George A. Wood and Sidney P. Howell, Jr., inspectors of election. Appellant charged that the election was being conducted in an unfair and illegal manner, and prayed the court to enter an order directing the inspectors of election to tabulate the votes and proxies cast and report to the court all the proceedings and all the challenges made; that full effect be given to the votes cast by the petitioner, and other stockholders similarly situated, at the meeting then in progress; and that an officer of the court be appointed to supervise the stockholders' meeting. He prayed that the defendants and all persons acting for or in concert with them be restrained from exercising any of the functions or

duties of their respective offices until the court should make an appropriate order governing their conduct at the stockholders' meeting. Code, § 13-205.

Thereupon, the Corporation Court entered an order directing the inspectors of election to tabulate the votes and proxies cast, and report to the court all the proceedings and all challenges made. It further restrained all persons from claiming or representing themselves to have been elected as directors of Lanston at such meeting. The stockholders' meeting was then recessed to October 13th, and the court proceeding continued until October 5, 1953.

On October 5th, pursuant to the above order, the inspectors of election reported to the court that 249,918 shares of common stock of Lanston were issued and outstanding as of the date the stock transfer books were closed; that 229,298 shares were represented at the meeting in person or by proxies; that after giving effect to the rulings of the inspectors on specific challenges, 105,336 were cast for Lanston's, that is, management's proposed directors, and 25,460 for the Stockholders Protective Committee's proposed directors; and that dissenting stockholders present at the meeting voted 6,511 shares for management's proposed directors and 92,091 for the Committee's proposed directors. Thus, had no challenges been offered there were 111,847 cast for management's proposed directors, and 117,551 for the nominees of the Protective Committee. The inspectors also filed with their report a recapitulation of the specific challenges, and their rulings thereon.

In explanation of their position, the inspectors made the following statement:

"The [Protective] Committee did not challenge shares of dissenting stockholders voting for Management, but called attention to the fact that, if the Management challenge to dissenting votes be sustained eventually, the same ruling should apply to shares of dissenting stockholders voting for Management.

"Disposition: The Inspectors sustained the challenge, upon advice of counsel. The Inspectors applied the ruling

to all votes of holders who had made valid dissent, whether such votes were for Management or for the Committee. A separate tabulation was made of such dissenting votes, showing those for Management and those for the Committee, and is set forth in the summary."

On October 5th, Lanston filed its cross-petition, in which it alleged that the meeting of stockholders begun on September 23 was a nullity and of no effect for various reasons, including fraud and illegality in the solicitation of stockholders' proxies. The issues raised were argued and taken under advisement by the court, and the stockholders' meeting was ordered to be further recessed until December 1st, 1953.

On October 27, 1953, the court entered a final order, which, in its pertinent provisions, decreed that the meeting which began on September 23rd was a nullity, and that no stockholders of Lanston were entitled to vote at that meeting. The stockholders' meeting was then ordered to be adjourned until further order of the court.

In its written opinion, the court said it appeared "at this point in this proposed merger that the rights of all are held in abeyance until the main issues of whether or not the agreement was fraudulent in its inception and whether or not the provisions of the merger law have been complied with are decided, and those issues now rest in other forums."

The question of the legality of the merger is, therefore, not before us. The charges of fraud and illegality, the conduct of Lanston and its directors, of Industries, of Bernard Fein, of Security and the other parties, and the right of the Lanston directors to file with the State Corporation Commission the application for a certificate of merger, were also expressly excluded from determination by the trial judge.

The questions for our determination are (1) whether, under the circumstances recited, the stockholders of Lanston holding more than one-tenth of its capital stock had the right normally accorded by § 13-190 of the Code to call the

special meeting of September 23, 1953, and (2) whether dissenting stockholders were entitled to vote at that meeting.

Appellant contends that the answer to both questions should be in the affirmative. He argues that his right to vote is inherent in and incidental to his ownership of the corporate stock, and that he cannot be deprived of that right without his consent. He further argues that the importance of the meeting of September 23, 1953, arises from the relationship of that meeting to the terms of the merger approval voted by the stockholders on April 24, 1953. He points out that the merger agreement provided that it should not be presented to the State Corporation Commission for a period of sixty days, and that at the end of the sixty-day period for dissenting, the directors would, in the light of the circumstances, including the dissents received, review the practicability and desirability of the merger. Since the by-laws of Lanston, at the time of the stockholders' approval of the merger, provided that directors would be elected on June 4, 1953, he claims that the decision as to the presentation of the merger agreement to the Corporation Commission was required to be made by the directors elected on that date, and not by the directors holding office on April 24, 1953, and that the change of the date for the annual stockholders' meeting was for the purpose of preventing the election of a board of directors who would have been opposed to the merger agreement.

The appellees, on the other hand, contend that after stockholders have once approved a merger agreement, the sixty-day period for filing dissents has elapsed, and the board of directors of their corporation has certified the approval and filed a copy of the agreement with the State Corporation Commission, the rights and status of all stockholders with respect to the merger become fixed, and stockholders are not entitled to a second vote on the merger; and that pending action by the Corporation Commission, intra-corporate relationships formerly created cannot be altered or disturbed. They further claim that a vote for or against a merger, and an election to dissent or not to

dissent, create two distinct classes of stockholders, each with rights and purposes antagonistic to the other; and that stockholders' approval of a merger agreement results in the suspending of or holding in abeyance the rights of *all* stockholders until the State Corporation Commission concludes its action on the application for the merger. They argue that to permit dissenting stockholders to vote in the interim between the stockholders' approval of the merger and its consummation would allow them to harmfully participate in the affairs of a corporation in which they no longer have an interest, except to receive the fair cash value of their stock at a certain date in the event of a consummation of the merger. They conclude that the statutes, and charter and by-law provisions of corporations fixing the voting right of stockholders apply only when stockholders meet on an equal basis, and thus under the circumstances present in this case no stockholder had a right to vote his stock at the special meeting in question.

The status of stockholders subsequent to stockholders' approval of a merger and prior to the consummation of the merger has not received much attention in the cases or from law writers. We have been referred to no case in this court, and we know of none, in which the precise question here presented has arisen. It is of first impression in this Commonwealth.

Some States have statutes which expressly provide that a dissenting stockholder, in the event of a merger, ceases to be a stockholder upon making demand for payment of his stock. *Johnson* v. *Baldwin*, 221 S. C. 141, 69 S. E. (2d) 585, 592. In other States there are statutes which provide that the dissenter does not lose his right as a stockholder until he has received the ascertainable value of his stock.* *Cole* v. *Wells*, 224 Mass. 504, 113 N. E. 189, 191.

---

*In a note on the subject of "Corporations—Rights of Dissenting Stockholders Pending Statutory Appraisal Proceedings," Volume 21, Virginia Law Review, (1935) page 825, the author, advocating express statutory provisions as to the rights of such stockholders, lists Arkansas, Florida, Michigan, Nevada, North Carolina, South Carolina, Tennessee, and the

Nothing in Lanston's charter or by-laws bears specifically on the question, or indicates any loss of rights by any class of stockholders. To the contrary, section 7 of Article A of the by-laws of Lanston provides that, "each person in whose name stock shall stand on the books of the Company at any date fixed by or pursuant to section 6 of Article V of these by-laws shall be entitled to one vote in person or by proxy for each share of stock appearing in his or her name on said books." (Section 6 of Article V relates to the fixing of a date for closing the stock transfer books of the corporation). This section is in accord with Code, § 13-193.

Section 2 of Article 1 of the same by-laws provides that, "A meeting of the stockholders other than the annual meeting may be held at any time upon the call of the Board of Directors, or of stockholders holding together at least one-tenth of the capital stock." This accords with Code, § 13-190.

The commonly accepted and basic concepts of the nature of corporate stock and of the rights its ownership confers would indicate that stockholders—whether assenting or dissenting—lose no rights pending consummation of an approved merger.

Shares of stock in a corporation constitute proprietary rights. They represent the proportion to which the respective shareholders are severally entitled in the distribution of the profits arising from the corporate business, and in the final distribution of the estate of the corporation, if it should cease to exist. All stockholders of the same class stand on

Philippine Islands, as having statutes providing that a dissenting stockholder loses his status as a stockholder as of the date fixed by statute for the determination of the value of his shares. He then says that a few of the States have statutes, such as those of New York and Virginia, citing Virginia Code, (Michie, 1930) § 3822, (now Virginia Code, 1950, § 13-51), which provide merely that upon payment of the agreed or determined value of the shares, the stockholder shall cease to have any interest in the merging corporation. He refers to an Indiana statute expressly providing for the cessation of the right of the dissenting stockholder upon the effective date of the merger or consolidation of his corporation, Ind. Gen. Corp. Act (1929) § 37.

equal footing, both as to rights and liabilities, and those rights cannot be changed except in the manner provided by law. The right of voting stock at corporate meetings is an incident of ownership; it is a part of the stockholder's property inherent in him by virtue of his title. *Carnegie Trust Co.* v. *Security Life Ins. Co.*, 111 Va. 1, 27, 68 S. E. 412, 31 L. R. A. (N. S.) 1186, 21 Ann Cas. 1287; 13 Am. Jur., Corporations, § 412, page 465; 18 C. J. S., Corporations, § 482, page 1156.

The holders of the majority of the shares of a corporation have the right and the power, by the election of directors and by the vote of their stock, to determine the policy of their corporation and to manage and control its action. Time, places, and notices of meetings of stockholders are matters of secondary importance, because the presence, the vote, and the protest of the holders of the minority of the stock are unavailing against the will of the holders of the majority. 13 Am. Jur., Corporations, Sec. 422, pages 474 *et seq*. It is not unusual to find a conflict of personal interest between a majority and minority of stockholders. Self-interest is not a disqualification of the right to vote, in the absence of fraud or other disqualification. 5 Fletcher Cyclopedia Corporations, Permanent Edition, Section 2031, pages 144, *et seq*., and cases cited.

In his excellent Cyclopedia Corporations, Judge Fletcher further sets out the nature of the stockholders' right to vote as follows:

"Speaking generally, the right to vote is a right which is inherent in and incidental to the ownership of corporate stock, and as such is a property right, and it follows that the stockholder cannot be deprived of it, and that the right cannot be essentially impaired, either by the legislature or the corporation, without his consent, through amending the charter or by-laws. *This is equally true though he is given what others might regard as a better right by way of substitute.* The legislature cannot indirectly impair such right by authorizing the directors, with the consent of only a

majority of the stockholders, to so amend the charter as to have that effect." Section 2025, page 119.  (Italics added.)

In *Walsh* v. *State*, 199 Ala. 123, 74 So. 45, 2 A. L. R. 551, 554, this is said:

"The right to hold annual elections for directors of a corporation, and to vote at such elections, is a right that is inherent in the ownership of stock in a corporation; and the stockholder, who appears by the books of the corporation to be such, cannot be deprived of this right upon the allegation that he proposes to use his legal rights for purposes which other stockholders may think not to the best interest, or even to the detriment, of the corporation.  (Citing cases.)

\* \* \* \* \* \* \*

"Where the charter of a corporation provides that annual meetings of stockholders shall be held for the election of officers and directors, the directors cannot, by a change in by-laws, so change the time of holding the annual election as to have the effect of continuing themselves in office, against the will of the majority of stockholders."  (Citing cases.)

The right to vote for directors is a right to protect property from loss, and to make its possession beneficial.  To deprive a stockholder of his right to vote is to deprive him of an essential attribute of his property. *Lord* v. *Equitable Life Assurance Society*, 194 N. Y. 212, 228, 87 N. E. 443.

See *Lawrence* v. *I. N. Parlier*, 15 Cal. (2d) 220, 100 Pac. (2d) 765, 770; *Brown* v. *McLanahan, et al.*, (4 C. C. A.) 148 Fed. (2d) 703, 708; *In Re: Giant Portland Cement Co.*, 26 Del. Ch. 32, 21 Atl. (2d) 697; *Outwater* v. *Public Service Corp.* 103 N. J. Eq. 461, 143 Atl. 729, 731.

■ Code, § 13-43 deals with the manner of consolidating or merging corporations.  While it provides that the fact of a favorable stockholders' vote upon an agreement for a merger "shall be certified" to the State Corporation Commission along with a copy of the agreement, it fixes no definite period as to the time within which it shall be certified.  The word "shall" merely relates to the necessity of

the certification and presentation of the merger agreement to the State Corporation Commission before the merger can become effective. The time of presentation may be dependent on business judgment and other factors, including circumstances similar to those present in this case. This section of the Code provides an essential of procedure but not of time. Code, § 13-44 deals with recordation of agreement and certificate, and § 13-45 with the consummation of the merger.

Section 13-46 was enacted in 1946, Acts of 1946, page 375. It was entitled "An Act to amend the Code of Virginia by adding a new section 3822 (b) so as to provide for service of notice of dissent for mergers or consolidations of corporations before presentation of the agreement to the State Corporation Commission in certain cases," and reads as follows:

"§ 13-46. Dissent of stockholders prior to consummation of merger or consolidation and abandonment of proposal.—An agreement of merger or consolidation may provide that notice of dissent by any stockholder may be served on the president, secretary or treasurer of his corporation, either within or without the State, or on the statutory agent thereof if such agent has been appointed, at any time within three months of the date of the meeting of the stockholders of his corporation to act on the agreement, without awaiting the consummation of the merger or consolidation. In such case notices of dissent shall be so served and when so served shall be valid for all purposes and the boards of directors of the several corporations need not present the agreement to the Commission until the expiration of the period for dissent provided in § 13-47 and such boards of directors may be authorized by the stockholders to terminate the agreement in lieu of presenting it to the Commission if of the opinion that the merger or consolidation is, in all the circumstances, including the dissents, impracticable or undesirable."

Sections 13-47, 13-48, 13-49, 13-50 and 13-51 had their origin in "An Act concerning corporations," Acts 1902-3-4,

Chapter 270, page 437, *et seq.*, which became effective May 21, 1903, and prior to 1950 were embodied in Sections 3822 and 3822 (a), Code of Virginia, Michie, 1946, as amended. These sections deal with the remedy of dissatisfied stockholders, and fix their rights against the *merged* or *consolidated* corporation. They apply only when a merger has been consummated.

Section 13-51 provides that upon payment or tender of payment by the merged corporation of the value of his stock ascertained under § 13-50, the dissenting stockholder shall deliver his certificate of stock to the merged corporation, if any has been issued, and if none has been issued shall make a due assignment to the merged corporation of *all his rights in respect thereto* and mark satisfied any judgment, entered under § 13-50, for its value, and if he refuses to receive payment or tender of payment, or refuses or fails to deliver his stock, or to mark the judgment satisfied, the merged corporation may deposit to the credit of the court, in which the proceeding is pending, the value of the stock and the court shall enter an order declaring the judgment satisfied, and, "Thereafter the rights of the stockholder under his stock in the consolidating or merging corporation shall cease and determine and his sole right shall be to receive the cash so deposited upon surrender to the consolidated or merged corporation of the certificate or certificates representing same if any were issued to him, and the consolidated or merged corporation may issue and dispose of the stock to which the dissenting stockholder would have been entitled under the agreement of consolidation or merger had he not dissented therefrom."

Sections 13-46 and 13-47 were amended in 1950, Acts of 1950, page 461, and the three-months period for filing dissents was changed to sixty days. The provision in § 13-46 that notice of dissent by any stockholder may be served on designated officers "of his corporation," without awaiting the consummation of the merger, and when so served shall be valid "for all purposes," manifestly means that the dis-

senter has the right to the appraisal provided in subsequent sections, without again serving notice of dissent on an officer of the merged corporation, as required by § 13-47.

The provision in § 13-46, incorporated in the present agreement itself, that boards of directors may be authorized by the stockholders to terminate the agreement in lieu of presenting it to the Commission, if termination is deemed advisable under the circumstances mentioned, expressly authorizes a consideration of the views of all stockholders expressed by their votes, their dissents, or other circumstances, subsequent to an approval of the merger by them. While the period for filing dissents is prescribed, there is no limitation of the time within which the stockholders may give the directors authority to terminate the agreement. So far as the statute is concerned, the authority may be given either before the stockholders' approval of the merger or subsequent to such approval.

Until consummation of the merger, Lanston and Industries remained separate and distinct, and no stock could be issued by the corporation into which it was proposed they be merged. The stockholders of the merging corporations remained stockholders of their respective corporations, with a continuing equity and interest in such corporations, subject to the contingency that the proposed merger be consummated. Upon consummation of a merger, the assenting stockholders lose all their rights in the merging corporations, and in exchange obtain stock in the merged corporation. Dissenting stockholders become entitled to receive from the *merged* corporation the fair cash value of their stock, ascertained in accordance with the statute, and upon payment or provision for payment, their rights in their stock in the merging or consolidating corporation cease and determine. Code, § 13-51.

Neither the merger agreement, the statutes involved, nor the charter or by-laws of the Corporation required the directors of Lanston in office at the time of the stockholders' approval of the merger to continue as such until the merger was consummated. They held office only for the period

prescribed by charter and by-laws. In the ordinary course of events, new directors could have been elected either at the annual meeting prescribed therefor, or at a meeting held as soon thereafter as might have been feasible, Code, § 13-204, in the place of directors who may have died, resigned from office, or otherwise had become disqualified to act. The power of management is vested in a board of directors, and not in the persons who hold the office of directors from time to time.

A stockholder may not be deprived of the property value of his stock or the rights inherent in its ownership, except by his consent or lawful process. So long as he is the legal owner of the shares standing in his name, he has the right to protect his corporate equity. He may join in a call for a meeting of stockholders, and vote at such meeting, unless disqualified by some express lawful provision. In Virginia, upon approval of a merger by majority vote, he may elect to assent, or dissent within a specified time. In the event he duly evidences his assent or dissent within the specified time, his rights and status as a stockholder continue, subject to be affected only by the consummation of the merger. If for any reason the merger agreement is not effected, his status remains unchanged. In the present case, the consummation of the merger, approved by the stockholders on April 24, 1953, was contingent both upon a subsequent determination of its practicability and desirability, and the approval of the State Corporation Commission.

To give effect to appellees' contention that all of the stockholders of Lanston lost their voting rights upon stockholders' approval of the merger would be to hold that corporate control was thereafter left wholly with the directors, until such time as the latter saw fit to file the merger agreement with the Corporation Commission and until the Commission approved. There would not be any power in the stockholders to meet and force the directors to file the agreement. The action of the Lanston's directors in providing that the annual meeting of the stockholders should be

held on July 30, 1953, three months after approval of the merger, is inconsistent with their argument.

We find nothing in our statutes relative to corporate mergers which limits or alters the fundamental right of a stockholder to vote in the interval between the stockholders' approval of the merger agreement and the consummation of the merger.

We think the provision in § 13-46 that boards of directors may be authorized by stockholders to terminate a merger agreement in lieu of presenting it to the Commission, "if of the opinion that the merger or consolidation is, in all the circumstances, including the dissents, impracticable or undesirable" shows that stockholders are not deprived of their status as such merely by a majority approval of the merger agreement once obtained, Directors are not thereafter denied the right to hold meetings, or to call stockholders' meetings. There is no limitation of time within which directors may decide to terminate a merger agreement, and none within which stockholders may not have the right to call a meeting for the purpose of directing action by the directors. Corporate action conferring authority on boards of directors can only be taken at corporate meetings, duly held according to statutory, charter and by-law provisions, and all stockholders of record are entitled to vote at such meetings, unless disqualified otherwise.

The provision of § 13-51 that not until the *merged corporation* has made payment of the value of his stock to a dissenting stockholder, or, where such stockholder has refused a tender of payment and the ascertainable amount has been deposited to the credit of the court in which the appraisal was made, shall his right "under his stock in the *consolidated* or *merging corporation*" cease and determine, is most significant.

Had the legislature intended to fix the status of the dissenting stockholder during the interval between stockholders' approval of the merger and its consummation, recognizing that a stockholder's voting rights may not be taken from

him except by lawful process, it was fully competent to make its meaning clear by appropriate legislation in language distinctly defining his status.

We conclude that appellant and other stockholders of Lanston holding together at least one-tenth of its capital stock, were entitled to call a special meeting on September 23, 1953, for the election of directors, and that appellant and other similarly situated stockholders had the right to vote for the directors of their corporation, subject to lawful conditions provided in the charter or by-laws of the corporation.

Our conclusion determines all of the issues which were raised in the pleadings in this proceeding and were considered by the trial court. We express no opinion as to various specific challenges, made by each of the parties, to the voting of proxies, based upon any ground other than that a dissenting stockholder was not entitled, as a matter of law, to vote at the special meeting in question.

The order of the trial court is reversed and the case is remanded to the trial court for such further proceedings as may be deemed necessary and proper, in accordance with the views herein expressed.

*Reversed and remanded.*