Present:  All the Justices

RONALD L. WILLARD, ON BEHALF OF
MONETA BUILDING SUPPLY, INC.
AND ALL ITS SHAREHOLDERS

v. Record No. 981836  OPINION BY JUSTICE CYNTHIA D. KINSER
                                        June 11, 1999
MONETA BUILDING SUPPLY, INC., ET AL.

FROM THE CIRCUIT COURT OF BEDFORD COUNTY
James W. Updike, Jr., Judge


This appeal involves a sale of the assets of a closely held corporation.  The minority stockholder of the corporation has attacked the propriety of the transaction, primarily on the grounds that the corporation's directors, who were also its majority stockholders, breached their statutory and common law duties by failing to maximize the sales price, by authorizing a transaction in which they had a conflict of interests, and by failing to comply with the statutory procedures for selling the assets of a corporation, not in the ordinary course of business.  Finding no error, we will affirm the circuit court's judgment upholding the transaction.

FACTS AND MATERIAL PROCEEDINGS

In 1978, Ronald L. Willard and Cappellari, Inc. (Cappellari), acquired a building supply business located in Bedford County.  Cappellari was a West Virginia corporation owned primarily by Amerigo S. (A.S.) and Rose

Mary Cappellari.  The purchasers incorporated the newly acquired business in Virginia under the name of Moneta Building Supply, Inc. (Moneta).  Willard purchased 20 percent of the shares of stock issued in Moneta, and Cappellari purchased 80 percent.[1]

In 1986, A.S. and Rose Mary dissolved Cappellari and distributed its shares of Moneta stock in the following proportions:  A.S. received 253 shares (49.8 percent), Rose Mary received 129 shares (25.4 percent), and David Lawrence Cappellari, the son of A.S. and Rose Mary, received 18 shares.[2]  Willard owned the remaining 100 shares (19.7 percent) of Moneta stock.

David served as president, director, and manager of Moneta from its inception until he resigned from those positions in 1996.  Willard was Moneta's only other officer and director during those initial years until A.S. and Rose Mary dissolved Cappellari.  Then, A.S. and Rose Mary, both of whom had lived in West Virginia and had participated

_____

[1] Originally, Willard and his wife purchased the 20 percent interest in Moneta.  Willard later obtained sole ownership of that interest.

[2] David ultimately purchased another eight shares of stock from Moneta after the corporation increased the number of its authorized shares.  After that purchase, David owned 26 shares (5.1 percent).

very little in the operation or management of Moneta, moved to Virginia and eventually became officers and directors of the corporation along with David and Willard.

No one disputes that Moneta experienced success in the building supply industry and achieved annual sales in excess of four million dollars by 1990. However, David became increasingly concerned about his future at Moneta because of a December 1, 1978 "Stock Purchase Agreement" entered into among Moneta, Cappellari, and the Willards. That agreement granted each of Moneta's stockholders a right of first refusal in the event that any one of the other stockholders desired to dispose of shares of Moneta stock. David was dissatisfied with his percentage of ownership interest in Moneta and his inability to acquire additional shares from his parents due to the "Stock Purchase Agreement."[3]

Consequently, David began developing a business plan to start his own building supply company. On September 18, 1996, David resigned from his positions as an officer and

_____

[3] David and his parents challenged the continuing applicability of the "Stock Purchase Agreement" by filing a declaratory judgment action in the Circuit Court of Bedford County. In an order dated November 7, 1995, the court held that the agreement governed both inter vivos and testamentary transfers of shares of Moneta stock. This Court refused a petition for appeal in that case.

director of Moneta.  At an October 3, 1996 meeting of the Moneta board of directors, the board accepted David's resignation and elected A.S. as president of Moneta, Rose Mary as vice-president, and Willard as treasurer.  The board also decided to continue Moneta's operations and to retain David as the interim manager while the board searched for a new manager.[4]

On October 7, 1996, Willard called a special meeting of the stockholders.  At that meeting, Willard offered to sell his shares of stock in Moneta for one million dollars.  No action was taken on Willard's offer.  During the meeting, David informed the stockholders that he might be interested in purchasing Moneta's assets, depending on what direction the company decided to take.  When Willard was asked whether he might also be interested in purchasing the assets, he indicated that he was not.[5]  Subsequent to the meeting, Willard tendered a letter of resignation as a director and officer of Moneta.  He cited "continuing

---

[4] Willard voted against the election of officers and the decision to employ David as the interim manager.

[5] It was also announced at that meeting that another Moneta employee had been promoted to manager, effective November 1, 1996.

oppression and unfair treatment" as the reasons for his decision.

After David's resignation from Moneta, he pursued his plans to open a building supply business. He incorporated a new company under the name of Capps Home & Building Supply, Inc. (Capps). On October 8, 1996, David entered into a "Confidentiality Agreement" with Moneta for the "exchange of certain information pertaining to [Moneta] and . . . the acquisition of certain assets of [Moneta] by [David]." A.S. executed the agreement in his capacity as president of Moneta.

These events prompted Willard to file a suit seeking the dissolution of Moneta and a preliminary injunction to enjoin any Moneta stockholder from competing with Moneta until the corporation could be dissolved and the assets liquidated.[6] The circuit court heard evidence and argument on October 24, 1996, and denied the requested injunction.

On November 15, 1996, Capps, through its counsel, submitted a proposed "Asset Purchase Agreement" to A.S. and

_____

[6] This suit was the second time that Willard had attempted to have Moneta dissolved. In the 1995 declaratory judgment action, Willard filed a counterclaim to dissolve Moneta on the basis that the majority stockholders had engaged in oppressive and unfair business practices to the detriment of the corporation and minority stockholder. The counterclaim was dismissed.

Rose Mary, in their capacities as directors and officers of Moneta. In the agreement, Capps offered to purchase the assets of Moneta for approximately $1.3 million. The offer would expire, however, if not accepted by November 23, 1996. Capps also informed A.S. and Rose Mary that David had acquired bank financing to provide the necessary funds if the proposed agreement received the approval of Moneta's board of directors and stockholders. Finally, Capps included a valuation of Moneta's assets with the agreement. Hope Player and Associates, P.C., had prepared a valuation report (the Player report) for Capps and, in that report, opined that the fair market value of Moneta's assets as of September 30, 1996, was $1.3 million.

On November 19, 1996, A.S. and Rose Mary, as the only remaining members of Moneta's board of directors, held a special meeting of the board at their home to consider the offer from Capps. The board "voted unanimously to accept the offer and direct[ed] the President to sign the Asset Purchase Agreement . . . reserving the right to negotiate the Seller's Representations contained in paragraph 4 of the . . . Agreement, and any other matters of concern to the shareholders." The board also voted to hire an

_____

independent certified public accountant or other valuation expert to evaluate whether the amount of the Capps offer reflected the fair market value of Moneta's assets. Finally, the board decided to refer the proposed transaction to the stockholders without any recommendation from the directors and to call a special meeting of the stockholders to be held on December 20, 1996, for the purpose of voting on the offer from Capps.

On November 21, 1996, Capps submitted a revised "Asset Purchase Agreement" to Moneta. In exchange for a reduction in the purchase price of approximately $150,000, Capps agreed to assume certain liabilities of Moneta. A.S. signed the revised agreement as president of Moneta without first presenting the changes to the board of directors.

A.S. then sent a notice to all Moneta stockholders advising them that a special meeting would be held on December 20 for the purpose of considering and voting upon the offer from Capps. The notice included a disclosure concerning the familial relationship among A.S., Rose Mary, and David, and copies of the revised "Asset Purchase Agreement" and the Player report.

After receiving notice of the December 20 special meeting, Willard sent a letter, dated December 10, 1996, to A.S. and Rose Mary informing them that he believed that

7

Capps' offer was too low and that it did not "adequately reflect fair value." In that letter, Willard offered to purchase Moneta's assets for $400,000 more than the amount Capps had offered. However, Willard stipulated that his offer was good only until 3:00 p.m. on December 13, 1996.

In a letter dated December 13, 1996, A.S. advised Willard that he and Rose Mary believed that it would be inappropriate for the board to consider his offer prior to the stockholders' meeting on December 20. Since Willard's offer specified that it would expire on December 13, A.S. encouraged Willard to come to the stockholders' meeting and present his offer at that time.

One day before the special meeting of the stockholders, Willard sent a second letter to A.S. and Rose Mary. In that letter, Willard increased his offer to $600,000 more than the amount offered by Capps. Willard also requested 30 days in which to evaluate the assets and determine if an even higher purchase price was warranted.

As authorized by the board of directors, Moneta obtained an opinion from Dr. Larry A. Lynch, a business valuation expert, with regard to whether the amount of Capps' offer reflected the fair market value of Moneta's assets. In a report dated December 12, 1996, Dr. Lynch stated that the value of Moneta's assets ranged from

8

$1,357,531 to $1,449,746, depending on the valuation method utilized. He concluded that Capps' offer of $1.3 million was fair and reasonable upon taking into consideration the fact that the "going concern assumption may be affected by the loss of key personnel and pending litigation." A copy of Dr. Lynch's report was forwarded to the stockholders prior to the special meeting on December 20.

The stockholders' special meeting proceeded as called on December 20, 1996.[7] A.S., David, and Willard were in attendance. Rose Mary did not attend, but she had given A.S. her proxy for the purpose of voting her shares of stock.[8] All parties in attendance were represented by legal counsel. At the meeting, A.S. informed the other stockholders about the recent offers tendered by Willard, including Willard's offer to sell his shares of stock in Moneta. A.S. advised Willard that he and Rose Mary would sell their stock for the same price per share, but Willard

_____

[7] Willard filed an action in the circuit court to enjoin the stockholders from convening the special meeting. After hearing evidence on December 17, 1996, the circuit court denied Willard's request for injunctive relief.

[8] David's resignation from Moneta had caused discord within the Cappellari family. Consequently, Rose Mary had delegated her authority as an officer and director of Moneta to A.S. at the end of the year. She was hospitalized at the time of the special meeting of

9

did not respond to that proposal. A.S. further stated "he would consider the best interest of the employees of [Moneta] as well as other non-monetary factors including the business' customers, continuity of management and the realistic threat to [Moneta] from competition if the property were not sold to Capps." Willard noted his objections to the offer from Capps and reiterated that he had a counter-offer on the table. A.S. stated that the only item of business to be acted upon at the meeting was the offer from Capps. A.S. and Rose Mary, by proxy, then voted to accept the offer from Capps. Willard voted against the proposal, and David abstained from voting. Thus, a majority of Moneta's stockholders approved the revised "Asset Purchase Agreement."

On April 23, 1997, Willard, on behalf of Moneta and all its stockholders, filed this shareholders' derivative suit pursuant to Code §§ 13.1-672.1 et seq., naming Moneta, A.S., Rose Mary, David, and Capps as defendants. In an amended bill of complaint, Willard sought to void the sale of Moneta's assets to Capps on the basis that the transaction violated the provisions of Code § 13.1-691 dealing with conflict of interests. He also requested an

_____

stockholders, but she was present at the special meeting of

10

award of damages for breach of fiduciary duties, violation of Code § 18.2-499, and common law conspiracy; the imposition of a constructive trust over the income and assets of Capps; and an award of expenses, attorney's fees, and court costs.

During a bench trial, the circuit court heard testimony with regard to the facts already recited.  In addition, the court received evidence from several experts who had appraised the value of Moneta's assets.  These experts differed in their opinions with regard to the appropriate valuation method and the actual value of the assets.  For example, Harry Schwarz testified that he valued the assets at $2,675,000 as of September 30, 1996, but acknowledged that he had not considered what effect, if any, David's leaving Moneta and opening his own building supply business would have on the value of the assets. Schwarz also included cash and securities in his valuation, but those assets were not sold to Capps.

Hope Player, who had prepared the Player report, testified that Moneta was surpassing its peers in terms of profitability.  She attributed that accomplishment to David's superior management skills.  Accordingly, she

_____

directors on November 19, 1996.

11

factored the effect of David's resignation into her valuation. Player also testified that, when comparing two offers to purchase, a prudent seller would take into consideration any contingencies associated with the offers, assuming that the buyers had equal motivation and ability.

Dr. Vittorio Bonomo, a professor of finance at Virginia Polytechnic Institute and State University, opined that any amount over $800,000 was a fair price for Moneta's assets. Dr. Bonomo believed that, during the first seven years after David left Moneta and opened his own competing business, Moneta's annual profits would fall by an amount somewhere between $400,000 and $100,000, primarily for two reasons: Moneta would be splitting the market with another competitor and that competitor would have "a good manager" rather than just "a norm manager." Thus, Dr. Bonomo opined that a director who was faced with the events that had occurred during the fall of 1996 would have to consider the subsequent financial consequences to Moneta if the Capps offer were not accepted.

In a letter opinion dated May 14, 1998, the circuit court explained that "[t]he wide discrepancy in valuation often depended upon the method utilized by the expert, and the extent to which the expert viewed, as a financial impact, the consequences of a competing business and the

12

loss of key personnel." The testimony of Dr. Bonomo, Dr. Lynch, and Ms. Player was more persuasive to the court than that of the other experts. Finding that Willard had failed to present sufficient evidence to prove his claims, the circuit court dismissed each of the seven counts in his amended bill of complaint in an order dated June 4, 1998. We awarded Willard this appeal.

## STANDARD OF REVIEW

The standard of appellate review applicable to this appeal is well settled. Since the circuit court heard the evidence ore tenus, its factual findings carry the same weight as a jury's verdict. W.S. Carnes, Inc. v. Board of Supervisors of Chesterfield County, 252 Va. 377, 385, 478 S.E.2d 295, 301 (1996). Under the provisions of Code § 8.01-680, the circuit court's judgment cannot be set aside unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it. Thus, we examine the evidence in the light most favorable to the defendants, the prevailing parties at trial. Id.

## DIRECTOR'S DISCHARGE OF DUTIES

In his first two assignments of error, Willard contends that the circuit court erred by ruling that A.S. and Rose Mary, as the only remaining directors of Moneta, did not have a duty to maximize the price received for the

13

sale of Moneta's assets and by concluding that they discharged their duties in accordance with the provisions of Code § 13.1-690. Willard asks us to judge the directors' decision to sell Moneta's assets to Capps by the test articulated in Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173 (Del. 1986). The Revlon court held that the duty of a board of directors changed from one of preserving the corporate entity "to the maximization of the company's value at a sale for the stockholders' benefit" when it becomes apparent that the sale of the company is inevitable. Id. at 182. "The directors' role [in that instance] change[s] from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." Id.

In addressing these issues, the circuit court found that A.S. and Rose Mary were not liable under Code § 13.1-690 because "[t]he evidence . . . clearly demonstrate[d] that defendants A.S. Cappellari and Rose Mary Cappellari, as directors of [Moneta], engaged in an informed decision making process that . . . produce[d] a defensible business decision." The court stated that § 13.1-690 does not require a director to maximize profits by accepting the highest bid when selling the assets of a corporation.

14

Instead, a director is required to "act in accordance with 'his good faith business judgment of the best interests of the corporation.'" The court further concluded that "[a] director may consider not only the quantity of an offer to purchase assets, but the quality of the offer." We agree.

The General Assembly has mandated the standard by which to evaluate a director's discharge of duties in Virginia. The applicable statute is Code § 13.1-690:

> A. A director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his good faith business judgment of the best interests of the corporation.
> B. Unless he has knowledge or information concerning the matter in question that makes reliance unwarranted, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:
> 1. One or more officers or employees of the corporation whom the director believes, in good faith, to be reliable and competent in the matters presented;
> 2. Legal counsel, public accountants, or other persons as to matters the director believes, in good faith, are within the person's professional or expert competence; or
> 3. A committee of the board of directors of which he is not a member if the director believes, in good faith, that the committee merits confidence.
> C. A director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section.
> D. A person alleging a violation of this section has the burden of proving the violation.

Code § 13.1-690(A) does not abrogate the common law duties of a director. It does, however, set the standard

by which a director is to discharge those duties.  If a director acts in accordance with that standard, Code § 13.1-690(C) provides a "safe harbor" that shields a director from liability for any action taken as a director, and for failure to take action.  Commonwealth Transp. Comm'r v. Matyiko, 253 Va. 1, 6, 481 S.E.2d 468, 470 (1997).

In adopting Code § 13.1-690, the General Assembly rejected § 8.30 of the Revised Model Business Corporation Act (RMBCA).  WLR Foods, Inc. v. Tyson Foods, Inc., 65 F.3d 1172, 1185 (4th Cir. 1995), cert. denied, 516 U.S. 1117 (1996); The Revision of Chapters 1 and 2 of Title 13.1 of the Code of Virginia, Report of the Virginia Code Commission to the Governor and the General Assembly of Virginia, H. Doc. No. 13, at 48-49 (1985).  That provision of the RMBCA requires a director to discharge the duties of the office in good faith, with the care that an ordinary prudent person in similar circumstances would exercise, and in a manner reasonably believed to be in the best interests of the corporation.

The contrast between the provisions of Code § 13.1-690 and those contained in § 8.30 of the RMBCA convinces us that, in Virginia, a director's discharge of duties is not measured by what a reasonable person would do in similar

circumstances or by the rationality of the ultimate decision. Instead, a director must act in accordance with his/her good faith business judgment of what is in the best interests of the corporation. Thus, the Revlon test is not applicable in Virginia.

Accordingly, we conclude that A.S. and Rose Mary were entitled to consider the quantity and quality of the offers to purchase Moneta's assets.[9] Contrary to Willard's argument, they were not required to accept an offer merely because it maximized the purchase price. Such a rule would mean that only one offer, among many, was in the best interests of the corporation. That result would erode the deference afforded a director's discharge of duties under Code § 13.1-690.

Turning to the facts of the present case, we agree with the circuit court's judgment that A.S. and Rose Mary engaged in an informed decision-making process. Pursuant

_____

[9] In Mills Acquisition Co. v. MacMillan, Inc., 559 A.2d 1261, 1282 n. 29 (Del. 1989), the court recognized that, in obtaining the highest price reasonably available for a corporation, a board of directors may consider "the adequacy and terms of the offer; its fairness and feasibility; the proposed or actual financing for the offer, and the consequences of that financing; . . . the risk of nonconsumation; the basic stockholder interests at stake; the bidder's identity, prior background and other business venture experiences; and the bidder's business

17

to Code § 13.1-690(B), a director can rely on information and opinions from, inter alia, legal counsel, accountants, and other experts unless the director has knowledge that such reliance is unwarranted.  Thus, a director may use an informed decision-making process in discharging the duties of the office as long as the director does so in good faith.  See WLR Foods, 65 F.3d at 1185.  When a director resorts to such a process, the ultimate decision must still reflect the director's "good faith business judgment of the best interests of the corporation" in order to receive the benefit of the "safe harbor" afforded in Code § 13.1-690(C).

A.S. testified that, when he received the first Asset Purchase Agreement, he compared the amount of the purchase price with a report dated July 15, 1996, from James T. Shepherd, a certified public accountant.[10]  Shepherd had estimated that the value of Moneta was $2,008,300. However, that amount included $240,900 for marketable securities that were not to be sold to Capps.  Shepherd

_____

plans for the corporation and their effects on stockholder interests."

[10] David had obtained the report from Shepherd when he first started developing his business plan.  The report was sent to A.S. by mistake.

18

also did not include any discounts for marketability or minority interests. A.S. also testified that he looked at the balance sheets for Moneta and concluded that the amount of the offer approximated the total amount of the stockholders' equity. So, before the special meeting of the directors on November 19, A.S. and Rose Mary had had the benefit of this information along with the Player report. By the time the stockholders met on December 20, they had received Dr. Lynch's report in which he opined that the offer from Capps was fair to the corporation.

Other factors were also relevant to the directors' discharge of their duties with regard to the sale of Moneta's assets. Willard first indicated that he was not interested in purchasing the assets, but then he made an offer that expired three days later. He did not submit his second offer until one day before the stockholders' special meeting. Furthermore, in Willard's second offer, he requested an additional 30 days in which to review the financial records of Moneta in more detail so that he could determine if an even higher purchase price was warranted. Thus, A.S. and Rose Mary were justified in their fear that the value of Moneta's assets would decline significantly if

_____

19

they waited and David opened his new business during those 30 days. A.S. and Rose Mary were obliged to consider this potential consequence. Even Willard had acknowledged the adverse impact that David's new business would have on the value of Moneta's assets.[11]

Thus, we conclude that A.S. and Rose Mary, in their capacities as directors, acted in good faith and used their business judgment by pursuing a course to achieve the result that they considered to be in the best interests of Moneta. They discharged their duties in accordance with Code § 13.1-690 and are, therefore, protected by the "safe harbor" afforded under subsection C of that statutory provision.[12]

_____

[11] At the hearing on October 24, Willard stated, "After Dave announces his opening and comes out of the ground, you can pretty much shut [Moneta] down by about a third right then."

[12] Because the objective reasonableness of a director's decision or conduct is not a relevant inquiry under § 13.1-690, we also conclude that the circuit court correctly held that Willard was not entitled to discover the substance of certain legal and financial advice that the defendants received. See WLR Foods, 65 F.3d at 1187. Furthermore, the circuit court actually reviewed all the requested material in camera and ordered the defendants to provide some of the documents to Willard. "Generally, the granting or denying of discovery is a matter within the discretion of the trial court and will not be reversed on appeal unless 'the action taken was improvident and affected substantial rights.'" O'Brian v. Langley School, 256 Va.

CONFLICT OF INTERESTS

Willard's third and fourth assignments of error address an alleged conflict of interests and a director's duty of loyalty.  Specifically, Willard asserts that the circuit court erred by ruling that A.S. and Rose Mary did not have a conflict of interests in the transaction to sell Moneta's assets to a corporation owned by their son.

The statute at issue is Code § 13.1-691, which provides the following, in pertinent part:

> A.  A conflict of interests transaction is a transaction with the corporation in which a director of the corporation has a direct or indirect personal interest.  A conflict of interests transaction is not voidable by the corporation solely because of the director's interest in the transaction if any one of the following is true:
> 1. The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved, or ratified the transaction;
> 2. The material facts of the transaction and the director's interest were disclosed to the shareholders entitled to vote and they authorized, approved, or ratified the transaction; or
> 3. The transaction was fair to the corporation.
> B.  For the purposes of this section, a director of the corporation has an indirect personal interest in a transaction if:
> 1. Another entity in which he has a material financial interest or in which he is a general partner is a party to the transaction; or

---

547, 552, 507 S.E.2d 363, 366 (1998) (quoting Rakes v. Fulcher, 210 Va. 542, 546, 172 S.E.2d 751, 755 (1970)).

21

        2. Another entity of which he is a director, officer or trustee is a party to the transaction and the transaction is or should be considered by the board of directors of the corporation.

Relying on our decision in <u>Izadpanah v. Boeing Joint Venture</u>, 243 Va. 81, 412 S.E.2d 708 (1992), the circuit court ruled that Willard had the initial burden of establishing a conflict of interests and that he failed to do so.[13]  The court determined that A.S. and Rose Mary, in their capacities as directors, did not have an "indirect personal interest" in the transaction, as that term is defined in Code § 13.1-691(B).  Aside from the familial relationship between son and parents, the court also found no evidence of a "direct personal interest in the transaction."  According to the court, the evidence actually demonstrated that David's resignation as an officer and director of Moneta and his new business plans had caused considerable discord between him and his parents.

_____

[13] The court also stated that if a plaintiff establishes a conflict of interests, the director then has the burden to prove compliance with Code § 13.1-691.  This allocation of the burden of proof is correct.  "[W]hen a conflict of interest as defined in § 13.1-691 exists, . . . the burden shifts to the directors to show that their actions complied with the requirements of that section." <u>Izadpanah</u>, 243 Va. at 83, 412 S.E.2d at 709; <u>accord</u> <u>Giannotti v. Hamway</u>, 239 Va. 14, 24, 387 S.E.2d 725, 731 (1990).

22

As an alternative finding, the court determined that, even if A.S. and Rose Mary had conflicts of interests in their capacities as directors, the transaction was, nevertheless, "fair to the corporation" pursuant to Code § 13.1-691(A)(3).  Thus, the circuit court held that the sale of Moneta's assets was not a voidable transaction under Code § 13.1-691.  Because we agree that the transaction was "fair," we need not address whether A.S. and Rose Mary had a conflict of interests because their son owned the corporation that purchased the assets of Moneta.[14]

No inflexible rule can be established by which to test the "fairness" of a transaction.  It depends largely on the nature and circumstances of the business action.  But generally, a director must act in good faith, and the transaction must, "as a whole, [be] open, fair and honest at the time it was consummated."  Deford v. Ballentine Realty Corp., 164 Va. 436, 449, 180 S.E. 164, 169 (1935); accord Adelman v. Conotti Corp., 215 Va. 782, 789-90, 213 S.E.2d 774, 779 (1975).  In sum, a transaction in which a

_____

[14] Although the General Assembly did not define "direct personal interest," we note that the RMBCA includes, in the definition of a "conflicting interest," a transaction with the corporation when the director knows that he or a related person is a party to or has a beneficial interest

director has a conflict of interests should bear "the earmarks of an arm's length bargain" in order to be deemed "fair to the corporation" under Code § 13.1-691(A)(3). Pepper v. Litton, 308 U.S. 295, 306-07 (1939).

Using these guidelines to review all aspects of the transaction in this case, we conclude that A.S. and Rose Mary carried their burden of proving that the sale of Moneta's assets to Capps was "fair to the corporation." Although we believe that the standard by which a transaction is judged under Code § 13.1-691(A)(3) is more exacting than that under § 13.1-690, the facts that support the circuit court's conclusion that A.S. and Rose Mary exercised their "good faith business judgment of the best interests of the corporation" equally sustain the court's judgment on this issue and need not be repeated.

Furthermore, when A.S. and Rose Mary, acting as Moneta's directors, accepted the offer from Capps, it was the only offer that had been presented to the board of directors at that time. After Willard made his first offer, the directors did not refuse to consider it. Instead, they believed it would be inappropriate to take any action on the offer prior to the special meeting of the

_____

in the transaction. § 8.60(1). Under § 8.60(3), the term

24

stockholders since the notice for that meeting had already been given to the stockholders.  Even though Willard's first offer expired three days after he made it, A.S. encouraged Willard to present his offer to the stockholders.  Willard did not make his second offer until one day before the stockholders' special meeting.[15] However, that offer included Willard's request for 30 days in which to evaluate the value of Moneta's assets.

During the stockholders' meeting, A.S. informed everyone about Willard's offers.  The stockholders had already received copies of the revised "Asset Purchase Agreement" and the reports from Dr. Lynch and Player.  Thus, the directors and stockholders of this closely held corporation possessed all the available information concerning the value and sale of Moneta's assets.  When the stockholders met on December 20, the options were either to accept the offer from Capps or to forego that opportunity to sell Moneta's assets and wait for the outcome of a further evaluation of the assets by Willard while David opened his competing business.  Therefore, we conclude that the transaction was, "as a whole, open, fair and honest at

_____

"related person" encompasses children of the director.

the time it was consummated" and is, accordingly, not voidable under Code § 13.1-691.

Willard, nevertheless, asserts that a finding that the sale of assets is not voidable under Code § 13.1-691 does not necessarily resolve the question whether A.S. and Rose Mary are liable for breach of their common law duty of loyalty. Generally, we agree with that proposition. However, having established the "fairness" of the transaction under Code § 13.1-691(A)(3), it necessarily follows that A.S. and Rose Mary discharged their duty of loyalty in compliance with Code § 13.1-690.

MAJORITY STOCKHOLDERS' RIGHTS

We next address Willard's contention that the circuit court erred by finding that A.S. and Rose Mary could "avoid the fiduciary duties they owed as directors by simply referring the asset sale to themselves as shareholders and then voting 'as shareholders' to approve the transaction." Willard argues that directors cannot be allowed to abdicate their duties by replacing their "director[s'] hats" with their "shareholder[s'] hats."

_____

[15] In fact, Willard did not present his second offer until after his unsuccessful attempt to enjoin the stockholders from convening the special meeting.

26

With regard to the duties of majority stockholders, the circuit court determined that A.S.'s decision to vote his and Rose Mary's shares of stock to accept the revised "Asset Purchase Agreement" was not "illegal, oppressive, fraudulent, or wasteful."  Absent a violation of Code § 13.1-747,[16] the court opined that stockholders own their stock and can vote it.

In Glass v. Glass, 228 Va. 39, 53-54, 321 S.E.2d 69, 78 (1984), we recognized that "majority stockholders [have] rights for which they [are] entitled to protection.  They [have] the right to retain their stock, to control the management of the [c]orporation, and to act together to accomplish their legitimate aims."  Similarly, in Fein v. Lanston Monotype Mach. Co., 196 Va. 753, 766, 85 S.E.2d 353, 360 (1955), we stated that "[t]he holders of the majority of the shares of a corporation have the right and the power, by the election of directors and by the vote of their stock, to determine the policy of their corporation and to manage and control its action."

---

[16] Code § 13.1-747 provides, in part, that a circuit court may dissolve a corporation if, inter alia, the directors are acting in a manner that is illegal, oppressive, or fraudulent.

27

Accordingly, we conclude that A.S. and Rose Mary were entitled to exercise their rights as the majority stockholders by voting to approve the sale of assets to Capps.  We agree with the circuit court's judgment that their conduct was not "illegal, oppressive, or fraudulent" under Code § 13.1-747.  Any self-interest on the part of a majority stockholder "is not a disqualification of the right to vote, in the absence of fraud or other disqualification."  196 Va. at 766, 85 S.E.2d at 360.

STATUTORY REQUIREMENTS FOR
SELLING CORPORATION'S ASSETS

Willard next attacks the directors' compliance with the provisions of Code § 13.1-724.[17]  Specifically, Willard

_____

[17] Code § 13.1-724 provides the following, in pertinent part:

> A.  A corporation may sell, lease, exchange, or otherwise dispose of all, or substantially all, of its property, otherwise than in the usual and regular course of business, on the terms and conditions and for the consideration determined by the corporation's board of directors, if the board of directors adopts and its shareholders approve the proposed transaction.
> B.  For a transaction to be authorized:
> 1. The board of directors shall submit the proposed transaction to the shareholders with its recommendation unless the board of directors determines that because of conflict of interests or other special circumstances it should make no recommendation and communicates the basis for its determination to the shareholders with the submission of the proposed transaction; and
> 2. The shareholders entitled to vote shall

asserts that A.S. and Rose Mary failed to follow the procedures contained in subsection (B)(1) in two respects: (1) that the board of directors failed to communicate the "basis for its determination" that the proposed transaction would be submitted to the stockholders with no recommendation from the directors; and (2) that the proposed "Asset Purchase Agreement" sent to the stockholders for approval was actually different from the one approved by the board of directors.

The notice of the December 20, 1996 special meeting of stockholders disclosed the familial relationship among A.S., Rose Mary, and David. According to the circuit court, that relationship was a "special circumstance" that formed the basis of the decision by the board to refer the proposed transaction to the stockholders without a recommendation. We agree. Disclosure of the familial relationship in the notice for the special meeting of stockholders was sufficient notification of the basis for the board's decision. Thus, the disclosure satisfied the requirements of Code § 13.1-747(B)(1).

---

approve the transaction as provided in subsection E of this section.

29

The court also found that the terms of the revised "Asset Purchase Agreement," which A.S. signed without board approval, fell within the authority to negotiate that the board of directors had granted to him at the special meeting on November 19, 1996. The minutes of the special meeting of the board of directors on November 19 reflect that the board authorized A.S. to sign the agreement but reserved the right for him to negotiate any matters of concern to the stockholders. In the revised document, Capps agreed to assume certain liabilities of Moneta; whereas, the original agreement stated that Capps "shall not assume any liabilities of [Moneta]." While this modification resulted in a reduction in the purchase price, we believe that the outstanding liabilities of the seller and the extent to which the buyer will assume those liabilities are matters of concern to stockholders. Thus, we conclude that A.S. acted within the authority granted to him when he executed the revised "Asset Purchase Agreement" and that the submission of that agreement to the stockholders for approval did not violate the requirements of Code § 13.1-724(B)(1), even though it contained some terms that were different from those in the original agreement approved by the board of directors.

CONCLUSION

30

To summarize, A.S. and Rose Mary, as the only remaining directors of Moneta, discharged their duties in accordance with their "good faith business judgment of the best interests of the corporation" by approving the sale of Moneta's assets to Capps.  They not only engaged in an informed decision-making process to the extent possible, given the limited amount of time in which they had to evaluate the offers from Capps and Willard, but they also considered both the quantity and quality of the offers.  Moreover, the transaction was "fair to the corporation" under the more demanding standard mandated by Code § 13.1-691(A)(3).  A.S. and Rose Mary also complied with the procedures required in Code § 13.1-724 for the sale of a corporation's assets, not in the ordinary course of business.  Thus, for the reasons stated, we will affirm the judgment of the circuit court.[18]

<u>Affirmed.</u>

JUSTICE KOONTZ, with whom JUSTICE HASSELL joins, dissenting.

_____

[18] Willard also assigned error to the circuit court's refusal to impose a constructive trust on the assets sold to Capps and to award Willard his attorney's fees and costs.  However, on brief, Willard asked this Court to reverse the circuit court's decision on this issue <u>if</u> we also reversed the court's approval of the transaction.  Since we are affirming the circuit court's judgment, we need not address this assignment of error on its merits.

I respectfully dissent. In my view, only by placing form over substance can the record in this case support the trial court's judgment that Ronald L. Willard failed to carry his burden of proof that Amerigo S. and Rose Mary Cappellari, the sole directors and majority stockholders of Moneta Building Supply, Inc. (Moneta), did not discharge their duty of loyalty in compliance with Code § 13.1-690.

Without repeating the generally undisputed facts recited in the majority opinion, it is clear that the record establishes that Mr. and Mrs. Cappellari knew that the transaction in question involved the sale of Moneta's operating assets to Capps Home & Building Supply Center, Inc. (Capps), a corporation owned by their son, David Lawrence Cappellari. In addition, the record establishes that although Mr. and Mrs. Cappellari were unhappy with their son's decision to leave Moneta and to open Capps in direct competition with it, they were aware that the acquisition of Moneta's assets would shorten the time until Capps would become operational and be a source of substantial income for their son. Indeed, this transaction would permit their son to begin operating Capps in Moneta's real estate with its entire inventory and, thus, become operational immediately upon the close of the transaction

without the delays inherent in opening any new business. This benefit to their son is patent.

Under these circumstances, Mr. and Mrs. Cappellari had a conflict of interests in this transaction because they had a "direct personal . . . interest" in that transaction as contemplated by Code § 13.1-691. That statute does not define this term. However, "direct . . . personal interest" is a broad term and, absent restrictive language in the statute, it is not limited to direct financial considerations. Rather, common sense dictates that where a parent is in a position as a director of a closely held corporation to assist his or her child in acquiring the assets of the corporation to the benefit of the child, that director has a direct personal interest in such a transaction as contemplated by Code § 13.1-691.

Notwithstanding this conflict of interests, I do not disagree with the majority's conclusion that on this record this transaction was not void or voidable under Code § 13.1-691. In the context of that code section, the record supports the trial court's judgment, and the majority opinion, that the transaction was "fair to the corporation" under Code § 13.1-691(A)(3). This is so because Capps' offer was at least consistent with the value of Moneta's assets.

33

However, Code § 13.1-691 by its express terms merely protects a conflict of interests transaction from being rendered void solely because of a director's conflict. This code section does not address the potential liability of a director who has a conflict of interests in a particular transaction. That issue is to be resolved under Code § 13.1-690, which requires the director to discharge his duties "in accordance with his good faith business judgment of the best interests of the corporation." It is in this context that I disagree with the conclusion of the majority opinion, on the particular facts of this case, that because the transaction in question was not voidable because it was "fair" under Code § 13.1-691(A)(3), it necessarily follows that the directors discharged their duty of loyalty in compliance with Code § 13.1-690.

It is undisputed that on November 15, 1996, Capps offered $1.3 million to purchase the assets of Moneta, including its real estate, inventory, equipment, vehicles, supplies, office furniture, fixtures, improvements and the exclusive right to use the trade name "Moneta Building Supply." Without question, once this transaction was complete Moneta would cease to exist as an operating business. All that would remain to be done would be a distribution of the proceeds of this sale to the

34

shareholders.  It is also undisputed that prior to the shareholder approval of this offer, the directors received two offers from Willard.  In pertinent part, the last offer contained the following provisions:

> I am now offering to pay $600,000.00 more than Capps for the same assets as set forth in the November 15, 1996 Asset Purchase Agreement, and under the same terms an [sic] conditions as set forth therein, provided that the business is run in the ordinary course until closing and the telephone number of the business is included in the assets.
>
> . . . .
>
> I am making my offer without any real opportunity to investigate in detail the value of the assets of Moneta Building Supply, Inc.  I am confident that if given that opportunity, I would further increase my offer substantially.  Accordingly, while the foregoing offer remains in effect, I would request 30 days to fully evaluate the assets and determine whether a higher value is appropriate.

There is no suggestion in the record that Willard was not financially able to consummate this offer if it was accepted.  Willard's offer of $600,000 more than the Capps offer was not conditioned upon being granted an additional 30 days in which to review financial records of Moneta in more detail.  Thus, the record establishes that the directors had two competing offers to consider, and one in which they had a direct personal interest.  Significantly, the latter offer was the lower of the two offers.

35

In this context, the record does not support the trial court's conclusion that Mr. and Mrs. Cappellari "engaged in an informed decision making process that . . . produce[d] a defensible business decision." The record reflects that they never met as directors to consider Willard's offer. Thus, the record does not support the conclusion that they discharged their duties as directors in accordance with their "good faith business judgment of the best interests of the corporation" as contemplated by Code § 13.1-690. Rather, the record establishes that the directors preferred their son to be able to purchase Moneta's assets and that they engaged professional advice solely to shape a process under Code § 13.1-690 to accomplish that end. This was mere form over substance.

While I agree with the majority that Mr. and Mrs. Cappellari were not required to accept Willard's offer merely because it maximized the purchase price and that they were entitled to consider not only the quantity of the offer but also the quality of the offer, the record simply does not support the conclusion that this was done. Moreover, because of their direct personal interest in the Capps transaction, it is clear that they were not exercising good faith business judgment because all their efforts were directed at upholding the Capps offer to the

36

exclusion of any consideration of the Willard offer.  Under these circumstances they were not entitled to the protection of Code § 13.2-690(C) and they failed to discharge their duty of loyalty in not considering the offer that would maximize the purchase price for Moneta's assets.

For these reasons, I would reverse the judgment of the trial court and remand this case to the trial court for a determination of what damages, if any, Willard might establish in a new trial limited to that issue.